UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

SUSAN HADMAN,

      Plaintiff,

 -against-

KATHLEEN SEBELIUS, SECRETARY, UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

      Defendant.

------------------------------------------------------------------ X

09-CV-4414 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

  Susan Hadman brings this employment discrimination action against Kathleen Sebelius, Secretary for the United States Department of Health and Human Services, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq ("Title VII"). She alleges that she was discriminated against in her employment at the Food and Drug Administration ("FDA") on the basis of her race and national origin. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the court grants defendant's motion.

## BACKGROUND[1]

  Plaintiff is an Asian-Pacific female of Filipino national origin. Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts and Plaintiff's Counterstatement of Facts ("Statement of Facts") ¶ 1.[2] She works as a G-12 Microbiologist in the Microbiology Branch of the FDA's National Regional Laboratory ("NRL"), where she has been employed since March of 1994. Id.

---

[1] Except as otherwise noted, the facts outlined are undisputed.
[2] Where the court cites the parties' combined Statement of Facts, plaintiff has either admitted defendant's statement of fact or has failed to properly address defendant's assertion of fact, such that the court shall consider it undisputed for the purpose of this motion. See Fed. R. Civ. P. 56(e).

1

¶ 2. Plaintiff alleges that she was discriminated against when the NRL director, Michael Palmieri, selected two Caucasian employees—instead of plaintiff—to attend an antimicrobial assay training course in Denver, Colorado, from April 7, 2008, to April 11, 2008. Id. ¶¶ 3, 10; Compl. ¶¶ 7, 14.

An antimicrobial assay, also referred to as a microbial assay, is a microbiological test used to determine the real biological activity of an antibiotic of concern. Statement of Facts ¶ 11. The NRL does not conduct antimicrobial assays as a part of its normal workload, and performance of antimicrobial assays is not a general requirement of Microbiologists at the NRL. Id. ¶ 77. In 2007, however, pursuant a project agreement between the FDA and the United States Pharmacapia ("CRADA Agreement"), the NRL began conducting antimicrobial assays on a non-routine, paid basis.[3] Id. ¶¶ 12, 14, 23; Pl.'s Dep. at 230. As part of the project, a supervisor at the NRL assigned plaintiff as lead analyst to antimicrobial assay sample #427663 ("CRADA sample" or "sample") in August 2007. Statement of Facts ¶¶ 15-16. Plaintiff completed analysis of the sample in October 2007 and reported working a total of 327 hours on it; her colleagues reported having worked another 90 hours on the CRADA sample, for a total of 417 hours. Id. ¶¶ 18-20; Def.'s Ex. E2.

On October 29, 2007, Thomas Savage of the FDA Headquarters' Division of Field Science ("FDA Headquarters") sent an email regarding the CRADA sample to Palmieri, the NRL director, stating:

> Mike...
> Just a FYI...Denver lab and NRL were both assigned this CRADA sample (microbial assay). DEN got it done in 77 hours. NRL's reported time was 417 hours.
> ...Tom

---

[3] Though the NRL conducted some antimicrobial assays prior to 2007, it is undisputed that such assays are not part of the NRL's typical work and that no such assays were conducted between 2002 and 2007. See Pl.'s Dep. at 230.

2

Statement of Facts ¶ 22; Def.'s Ex. E1. On October 31, 2007, Palmieri forwarded the email to, inter alia, plaintiff's first- and second-level supervisors, with a comment stating that "[t]he amount of time reported is absurd, illogical, and downright embarrassing" and asking whether anyone had questioned it. Def.'s Ex. E2. Plaintiff's supervisor forwarded the email to plaintiff. Statement of Facts ¶ 28. According to plaintiff, Palmieri believed that she had double charged time. Id. ¶ 29. Plaintiff verified that she had worked 327 hours on the CRADA sample and emailed her supervisor and Palmieri with an explanation of the amount of time it took her to complete the analysis. Id. ¶¶ 30-32. On January 25, 2008, Palmieri and plaintiff's first- and second-level supervisors met with plaintiff to discuss the issue. Id. ¶ 33. At the meeting, Palmieri expressed concern that plaintiff had taken an excessive amount of time to complete the assay, resulting in a complaint from FDA Headquarters. He also stated that plaintiff's response to his concerns was not plausible. Id. ¶¶ 34-35.[4]

Following the inquiry into the amount of time it took to complete the CRADA sample assay, Palmieri informed Tom Savage of FDA Headquarters, in an email dated January 25, 2008, that:

> [The] NRL will no longer perform the USP microbial assays. The outcome of an investigation of a valid major complaint as required by the Quality Management System has indicated the root cause, corrective action and preventative action would be best served by the cessation of this type of work. Therefore, to provide better customer service..., I am recommending that all samples targeted for microbial assays be redirected to the Denver laboratory. They have the expertise to perform the assays within a reasonable amount of time.

Def.'s Ex. E4; Statement of Facts ¶¶ 37-38. Palmieri, however, was advised that, under the terms of the CRADA agreement, the NRL would have to continue doing antimicrobial assay work. Id. ¶ 39.

According to Palmieri, he decided that, if the NRL was required to continue to perform

---

[4] Plaintiff disputes the truth of Palmieri's statements but does not dispute that he made them. See id.

3

antimicrobial assays, he wanted to have the work done by employees whom he considered to be strong performers and capable of completing the assays in a timely fashion. Id. ¶¶ 40-42; Def. Ex. R ¶¶ 5, 7. Palmieri arranged for a week-long training in antimicrobial assay analysis at the Denver laboratory, and he picked two employees, whom he believed met the desired requirements, to attend the training.[5] Id. Both of the chosen employees were Caucasian. Statement of Facts ¶ 50. NRL's training procedures require that formal training courses be announced to employees. Id. ¶ 43. The antimicrobial assay analysis training, which was not offered through the national or local training program, was not announced. Id. ¶¶ 43, 45.

When she learned of the training and that she had not been selected to attend it, plaintiff asked to speak with Palmieri. Id. ¶ 59. She met with him, with a union steward present, on April 3, 2008. Id. ¶¶ 60-61. At the meeting, plaintiff asked to attend the Denver training, which was scheduled to start the following week, and Palmieri informed her that it was too late to attend. Id. ¶¶ 62-63. Palmieri told plaintiff that he did not select her to attend the training because of concerns about her performance: it had taken her too much time to perform the CRADA sample analysis; he had received a complaint from outside the NRL about it, which he regarded as a major issue for the laboratory; and he questioned plaintiff's judgment. Id. ¶ 64. The following week, after the training had begun, plaintiff learned that one of the employees selected for the training was not able to attend because of a death in the family, and plaintiff reiterated her request to attend the training. Id. ¶¶ 66-67. Plaintiff was told that it was too late for her to attend but that the employee attending the Denver course could train plaintiff in antimicrobial assay analysis when he returned to the NRL. Id. ¶¶ 67-68; Pl.'s Ex. 1 ¶ 20.

On or about April 9, 2008, plaintiff contacted the FDA's Office of Equal Employment

---

[5] As discussed below, plaintiff disputes that these proffered reasons were the actual motivation for Palmieri's non-selection of plaintiff for the Denver training.

Opportunity and Diversity Management and alleged that she had been discriminated against based on race and national origin when she was not selected to attend the antimicrobial assay training course. Statement of Facts ¶¶ 88-89; Def.'s Ex. M. Plaintiff thereafter filed a formal complaint of discrimination. Statement of Facts ¶ 92. On June 30, 2009, the Administrative Law Judge ("ALJ") issued a decision in favor of the Agency, and, on August 7, 2009, defendant issued a Final Agency Decision fully implementing the ALJ's order. Id. ¶¶ 94-95. On August 12, 2009, plaintiff initiated the instant action.

## DISCUSSION

I.  Standard on Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003) (internal quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any

material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment against it, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

II. Plaintiff's Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Analysis of Title VII claims are evaluated under the three-part burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See, e.g., Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005). Under this framework, plaintiff bears the initial burden of making out a prima facie case of discrimination by showing, by a preponderance of the evidence, that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See, e.g., Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002). Plaintiff's burden of proof at this stage has been characterized as "'minimal' and 'de minimus,'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)), but "it is not non-existent,"

Almond v. Westchester Cnty. Dep't of Corr., 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006).

If plaintiff carries her initial burden, the burden shifts to the defendant to identify "'some legitimate, nondiscriminatory reason'" for its action. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) (quoting McDonnell Douglas, 411 U.S. at 802). If defendant meets this burden, "the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual." Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006) (citing Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004)). Speculation and conclusory allegations of discrimination are not sufficient to meet this burden at the summary judgment stage. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."); Little v. New York, No. 96-CV-5132, 1998 Dist. LEXIS 21797 (E.D.N.Y. June 8, 1998) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."), aff'd 173 F.3d 845 (2d Cir. 1999). Instead, plaintiff must come forward with "'concrete particulars,'" R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)), that "would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).

### A. Plaintiff Has Not Established a Prima Facie Case

The parties do not dispute that plaintiff has established the first two elements of her prima facie case: that she is a member of a protected class and that she is qualified for her position.

The parties, however, do dispute whether plaintiff has proven the third and fourth elements: that she suffered an adverse employment action and that the action occurred under circumstances giving rise to an inference of discrimination. Plaintiff maintains that she suffered an adverse employment action because she "was denied a training session that was related to her official duties and had a direct negative impact on her career." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."), at 8. Plaintiff further argues that these adverse employment actions took place under circumstances giving rise to an inference of discrimination because she was treated differently from similarly situated individuals outside of her protected class. Id. at 9-10. Defendant asserts that none of the alleged incidents cited by plaintiff rise to the level of an adverse employment action under the law and that plaintiff was not similarly situated to the employees selected for the training course such that their selection over plaintiff could give rise to an inference of discrimination. Based on its review of the undisputed evidence in the record, the court holds that plaintiff has not established that she suffered an adverse employment action and that, even if she did, it did not occur under circumstances giving rise to an inference of discrimination.

  i. Adverse Employment Action

In the context of a disparate treatment claim, "a plaintiff demonstrates an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Hill, 467 F. Supp. 2d at 351 (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Galabya, 202 F.3d at 640 (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). "Such a change might be a demotion, a reduction of wages, a loss of benefits, a

significant loss of material responsibilities, or another action particular to Plaintiff's circumstances." Hill, 467 F. Supp. 2d at 351. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." Id. (citation and internal quotation marks omitted). "Because there are no bright-line rules as to which employment actions meet the threshold for adverse, courts must make this determination on a case-by-case basis." Id.

To the degree that plaintiff asserts that the denial of training constituted a per se adverse employment action, her argument fails as a matter of law. Denial of training, without a showing of some injury therefrom, cannot alone constitute an adverse employment action. See Hill, 467 F. Supp. 2d at 352 ("When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action."). Plaintiff's argument that she received a lesser employment review and thereby suffered an adverse employment action is also legally precluded and not supported by the record. As a matter of law, plaintiff's receipt of a "lesser review" is not an adverse employment action. See Nakis v. Potter, No. 01-cv-10047, 2004 U.S. Dist. LEXIS 25250, *61-62 (S.D.N.Y. Nov. 30, 2004) ("[U]nder the law of this Circuit, a negative employment evaluation, standing alone, cannot constitute an adverse employment action."). Moreover, the record demonstrates and plaintiff has admitted that her performance reviews for the years after she was allegedly denied training were similar to or better than those that she received before the training course was held. Statement of Facts ¶¶ 79-80.

Plaintiff also has not shown that the denial of antimicrobial assay training led to a reduction in her job responsibilities rising to the level of an adverse employment action. A plaintiff may show that she has sustained an adverse employment action where she demonstrates

that she suffered "significantly diminished material responsibilities" in her working conditions. Galabya, 202 F.3d at 640. The only specific assertion that plaintiff makes in this regard is that she has not been able to train new hires since being denied antimicrobial assay training. The record, however, does not contain evidence that would allow a reasonable juror to conclude that the plaintiff's non-selection for antimicrobial assay training had any impact on her training of new employees. Plaintiff herself testified that she has never trained new hires in conducting antimicrobial assays and that training in antimicrobial assays is not necessary in order to train new hires. Pl.'s Dep. at 268. The record shows that, during her tenure at the NRL, plaintiff has conducted training on an intermittent, irregular basis, and that plaintiff trained new hires in her area of relative expertise, *virbrio vulnificus, vibrio paraheamolyticus*, the last time that the NRL offered training on that topic. Pl.'s Dep. at 267-76. Even viewed in the light most favorable to plaintiff, this evidence does not show that, by no longer being asked to train new employees, she has suffered "significantly diminished material responsibilities," rather than a mere "alteration of job responsibilities." Galabya, 202 F.3d at 640.

Nor would the record evidence permit a trier of fact to conclude that the denial of antimicrobial assay training affected plaintiff's promotional opportunities or caused her not to be selected for other high profile assignments or collaborative studies. "Denial of training can constitute an adverse employment action where it 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'" Hill, 467 F. Supp. 2d at 352 (quoting Nakis, 2004 U.S. Dist. LEXIS 25250, at *20). Plaintiff contends that the training would have enhanced her ability to perform on the voluntary Foreign Cadre—and to receive additional praise and promotions as a result—and that the denial of training was therefore an adverse employment action. Pl.'s Mem. at 8-9; Pl.'s Dep. at 74-75; Pl.'s Aff. ¶¶ 22-26.

Plaintiff also argues that the denial of training caused her not to be selected for other high profile assignments and collaborative studies "that look good on your resume and can lead to step increases and promotions." Pl.'s Aff. ¶¶ 27-31. Conceding that the methods learned in the antimicrobial assay training are not directly used in these other assignments, she argues that her non-selection for those assignments is related to her non-selection for the antimicrobial assay training course because "the more experience and training one has in non routine areas, the more likely that person is to be selected to work on other non routine tests and samples at the NRL." Id. ¶ 34. The record contains no evidence of the NRL's promotional practices, and plaintiff's claim that, after the training course, she would perform better, receive more high-profile assignments, and be promoted as a result are speculative. As these hypotheses are not supported by admissible evidence, they cannot create a genuine dispute as to any material fact sufficient to defeat summary judgment. See Fed. R. Civ. P. 56(a), (c).

### ii. Inference of Discrimination

In order to avoid summary judgment for defendant, plaintiff must show that the adverse employment action occurred in circumstances giving rise to an inference of racial or ethnic discrimination, as "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable." Hill, 467 F. Supp. 2d at 356 (quoting Nakis, 2004 U.S. Dist. LEXIS 25250, at *20 (internal quotation marks omitted)). Here, as is commonly the case, plaintiff seeks to satisfy this element by demonstrating that similarly situated persons, not of plaintiff's race, were treated differently from plaintiff. See id. She argues that she has met this requirement because she and the two Caucasians selected for antimicrobial assay training were similarly situated, in that they were all G-12 Microbiologists, but only plaintiff was excluded from the training course. "To be similarly situated, the[] persons

must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's." Hill, 467 F. Supp. 2d at 356. Unlike plaintiff, neither of the employees selected for training was the subject of a perceived complaint from FDA Headquarters regarding the time that it had taken to complete an antimicrobial assay. Because, before being selected for training, the two Caucasian employees had not engaged in conduct similar to plaintiff's (i.e., taking what was considered an inordinate amount of time to complete an antimicrobial assay), the court does not find them similarly situated to plaintiff. Plaintiff has not met her burden of making out a prima facie case of discrimination.

B. Plaintiff Has Not Shown that Defendant's Proffered Reasons are Pretexual

Assuming, arguendo, that plaintiff is able to make out a prima facie case of discrimination, defendant's motion must be granted because plaintiff is unable to satisfy her burden of showing that defendant's proffered reasons for its actions were false and that discrimination was defendant's true motivation. In response to plaintiff's allegations of discrimination, defendant states that plaintiff was not selected for the Denver training because Palmieri received a complaint from FDA Headquarters about the timeliness of plaintiff's work on the CRADA sample, was not satisfied with plaintiff's justification for the amount of the time it took her to complete the assay, and therefore decided to train two different employees, whom he thought would be the best candidates to complete the work in a timely manner in the future. Def.'s Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, at 15-20. The court finds this explanation to be a "legitimate, nondiscriminatory reason" for defendant's actions. McDonnell Douglas, 411 U.S. at 802. Plaintiff has not adduced evidence capable of showing that these reasons are pretextual or otherwise unworthy of credence. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Plaintiff first argues that Palmieri's history of discriminatory actions demonstrate pretext. In particular, she avers that Palmieri's history of problems with non-whites would permit a finding that the reasons proffered by defendant were pretexts for discrimination. But plaintiff's evidence in this regard is made up exclusively of generalized assertions lacking "concrete particulars" and of inadmissible hearsay not based on personal knowledge. R.G. Group, 751 F.2d at 77 (citation and internal quotation marks omitted); see Fed. R. Evid. 801, 802, 803; Fed. R. Civ. P. 56(c)(4); see also Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (stating that assertions made only on information and belief would not be admissible at trial because testimony as to facts must generally be based on personal knowledge); cf. Sarno v. Douglass Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (stating that a hearsay assertion is not competent material for a Rule 56 affidavit). Nor does Palmieri's purported denial of training to the two Asian employees who assisted plaintiff in conducting the CRADA sample analysis show an alleged bias against Asian employees. See Pl.'s Mem. at 10. The record is devoid of evidence indicating that either of those employees expressed an interest in the antimicrobial assay training course and, to the contrary, shows that one of them told Palmieri that he did not need such training. See Def.'s Ex R ¶ 7.

Plaintiff next argues that defendant's proffered reasons were demonstrably false and are not worthy of credence. Namely, plaintiff takes issue with the characterization of the email sent by FDA Headquarters as a complaint, noting that the email did not contain the words "complaint." Pl.'s Mem. at 2. However, whether the email was technically styled as a complaint is immaterial: it is undisputed that Palmieri treated the email as a complaint at the time he received it. Plaintiff also asserts that the two employees selected for training did not, in fact, have the qualities that Palmieri claims motivated his selection of them. Pl.'s Mem. at 12-13. In

support, plaintiff offers a report showing that one of these employees occasionally turned in assignments past their due date. The report, however, does not provide insight into the relative performance of the employee, does not offer insight into the employee's reputation, and does not cast doubt on Palmieri's statement that he never received a complaint about the timeliness of the employee's work. The report therefore does not show that defendant's proffered reasons for choosing that employee for the training course are not worthy of credence. Other than the report, plaintiff proffers her own affidavit testimony that the employees selected for training had only average reputations at work, not the good reputations that Palmieri attributed to them. Plaintiff's unsubstantiated opinion, offered in an affidavit opposing summary judgment and lacking specific factual support for its assertion that the chosen employees had only average reputations, is not alone sufficient to create a genuine dispute of fact for the jury.[6] Defendant is thus entitled to summary judgment. See Anderson, 477 U.S. at 249-50 ("If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

/s/(ARR)

Allyne R. Ross
United States District Judge

---

[6] Moreover, even if the two selected candidates were merely average employees, plaintiff has not provided evidence that she enjoyed a better reputation, such that their selection over her would suggest that defendant's reasons are pretexts for discrimination. See Burdine, 450 U.S. at 259 ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.").

Dated:     October 5, 2011
           Brooklyn, New York